IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Almetta T. Campbell, | ) | Civil Action No.: 4:10-cv-01380-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Hartford Life and Accident | ) | |
| Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court by way of the parties' cross-motions for judgment.[1] Plaintiff asserts entitlement to certain benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The parties entered into a Joint Stipulation agreeing to certain relevant facts. The parties also agreed that the court may dispose of this matter based upon cross-motions for judgment.[2]

**Procedural Overview**

Plaintiff's employer, Mohawk Carpet Corporation ("Mohawk"), established an employee welfare benefit plan to provide long term disability benefits (the "Plan") to eligible employees. Hartford insured the long term disability benefits provided under the Plan by policy of insurance no. GLT-674528 (the "Policy"). Under the Plan and Policy, Mohawk vested Hartford with

---

[1]Under Local Rule 7.08, "hearings on motions may be ordered by the Court in its discretion. Unless so ordered, motions may be determined without a hearing." The issues have been briefed and the administrative record has been submitted by the parties, and the Court believes no hearing is necessary.

[2]The Fourth Circuit Court of Appeals has recognized that the parties in an ERISA case may agree to waive the summary judgment standard and submit their case to the district court on the merits by way of cross-motions for judgment. *See Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 311 n.14 (4th Cir. 2002), *abrogated on other grounds* by *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256 (4th Cir. 2009).

authority to interpret plan terms and make benefit determinations. Initially, Plaintiff was paid long term disability benefits through the "Your Occupation" period provided in the Policy; however, Hartford denied Plaintiff's claim for benefits under the Policy's "Any Occupation" definition of disability, which became effective September 17, 2009. The decision was upheld on appeal on December 10, 2009. This lawsuit followed.

Pursuant to the Joint Stipulations agreed to by the parties, the parties agree that the Plaintiff asserts entitlement to long term disability benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B) and attorney's fees and costs pursuant to 29 U.S.C. § 1132(g). The parties also agree that the Plaintiff has properly exhausted administrative remedies available under the Plan. Further, the parties agree on the applicability of the Plan documents attached to the Joint Stipulations and have provided the administrative record to the Court. The issues before this Court are as follows: (1) What is the appropriate standard of review, and (2) whether the Defendant has abused its discretion, under the appropriate standard of review, in denying the Plaintiff's claim for continued long term disability benefits.

**Factual Background**

A.     Plaintiff Submits a Claim for Long Term Disability Benefits.

Plaintiff worked as a Spinning Operator for Mohawk. She worked 12-hour shifts three to four days per week. She worked at a spinning machine and was required to sit, stand, reach, and balance. (R. 00315-00316.)[3] According to Mohawk, Plaintiff's job could neither "be performed by alternating sitting and standing" nor "modified to accommodate [a] disability." (R. 00283). Plaintiff submitted a claim for long term disability benefits, which was received by Hartford on

---

[3]The administrative record is located at Docket Entries 23-1 through 23-7.

September 19, 2008. (R. 00319-00322.) Her first symptoms were "pain in my knee." Moreover, she said she "couldn't walk on [her] leg" after suffering an injury at work on June 11, 2008. When asked to list all physicians that she had seen, Plaintiff listed only Dr. John A. Smid. (R. 00320.)  An Attending Physician's Statement ("APS") from Dr. Smid was submitted with the claim, which indicated that Plaintiff was limited to minimal standing and walking for activities of daily living only, sitting for 2 hours at a time, and no lifting/carrying. (R. 00323-00324.) He had been seeing Plaintiff for this condition since June 11, 2008.  Her primary diagnosis was chondromalacia with meniscal tear in right knee. The secondary diagnosis was synovitis right knee.  The treatment for these conditions was surgery, and outpatient arthroscopic surgery was performed on August 8, 2008.  As of September 25, 2008, Plaintiff continued to complain of pain in her right knee; Dr. Smid noted that Plaintiff's arthroscopy did not pinpoint any specific pathology and he planned to continue physical therapy. (R. 00274).

B.    Long Term Disability Benefits Approved

On October 9, 2008, Hartford advised Plaintiff that it had approved her for long term disability benefits under the Policy's "Your Occupation" definition of disability, quoting the definition in its letter:

> 'Disability or Disabled for other employees means that during the Elimination Period and for the next 12 months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

3

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are Disabled.'

As of 09/17/2009, Disabled means per page 15 of your policy:

'Any Occupation means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.'

In no event, however, will benefits be payable beyond 09/16/2013.

(R. 00258-00261.) Hartford also provided a worksheet showing how it calculated Plaintiff's benefits. (R. 00261.)

Hartford continued to receive medical records concerning Plaintiff and evaluate those records to determine if Plaintiff could perform the duties of her own occupation through February 2009. For example, on December 4, 2008, Plaintiff advised Hartford that the swelling in her right knee was better, but she continued to have significant pain. She said she used a cane, but could hardly walk. On February 5, 2009, Dr. Smid completed a Restrictions and Limitations form that showed Plaintiff's diagnosis as "right knee pain." (R. 00243). Dr. Smid's treatment plan was "medication." According to the form, Plaintiff could sit two hours and stand or walk 30 minutes in an eight hour day. Dr. Smid noted that she should remain out of work until February 13, 2009 (the date of her next appointment); it was unknown when she would be able to return. Based on these records, benefits were continued.

4

C.     Hartford Begins to Investigate Claim for "Any Occupation"

On March 23, 2009, Hartford sent a letter to Plaintiff, advising that it would begin investigating Plaintiff's claim to determine if she will qualify for benefits under the Any Occupation definition on or after September 17, 2009. The letter explained the requirements that Plaintiff would have to meet to be eligible for continued benefits after September 17, 2009. (R. 00054-00055.) Plaintiff was asked to complete a new Claimant Questionnaire and Work and Education History Form. She was also asked to obtain a new APS and to provide copies of any Social Security awards. Hartford requested that Plaintiff submit all of the requested information within 21 days in order to avoid any delay in processing her claim. (R. 00054-00055.) In the meantime, Hartford determined that the medical records available at the time continued to support an inability to perform one or more of the Essential Duties of Plaintiff's own occupation, and benefits were continued. (R. 00029.).  On March 24, 2009, Plaintiff called Hartford and said she had not been approved for Social Security benefits, but did have an attorney.

Subsequently, Plaintiff sent information to Hartford, which was received on April 6, 2009. (R. 00231-00242.) In the Claimant Questionnaire, Plaintiff indicated that she was able to complete some of the listed activities of daily living with no assistance, but needed assistance to dress, toilet, and transfer from bed to chair. (R. 00233-00236.) When asked to describe her most current medical condition, Plaintiff responded: "[m]y back and knee area. Still can't stand or sit for a long period of time."  When asked about cognitive impairments, Plaintiff checked "no." (R. 00233.) The only physicians she identified were Dr. Smid and a Dr. Taylor in Laurinburg, North Carolina. (R. 00234.) Plaintiff included a copy of the notice that her claim for Social Security Disability benefits had been denied on March 24, 2009. (R. 00238.).

Plaintiff also enclosed an APS by Dr. Smid dated April 2, 2009. (R. 00231-00232.) The primary diagnosis was "[right] shoulder rotator cuff tear" and the secondary diagnosis was "[status post] arthroscopy [right] knee."   He described Plaintiff's subjective symptoms as "significant amount of pain."  He did not list any test results, but planned "[right] shoulder arthroscopy" for April 7, 2009, five days later. (R. 00232.) He did not respond to questions about how long Plaintiff could stand, sit, or walk. She could occasionally lift or carry up to 10 pounds with her right arm, but could never lift or carry more than 10 pounds with that arm. She could reach above her right shoulder with her right arm only occasionally, but could frequently use the right arm to lift at or below waist level. There were no restrictions on her use of her left arm. (R. 00231.)

On April 10, 2009, Dr. Smid returned a completed questionnaire regarding Plaintiff's functionality to Hartford. Dr. Smid indicated that Plaintiff could sit two hours at a time for an eight-hour day. Plaintiff could stand/walk for thirty minutes at a time, for a total of four hours per day. She could not use her upper right extremity. He explained that Plaintiff "just underwent right shoulder arthroscopy with rotator cuff repair" and said he expected her to reach maximum medical improvement within six months. (R. 00229.)  Hartford reviewed the information provided, including the Physical Demands Analysis for Plaintiff's job as a Spinner Operator. The normal period of recovery for the arthroscopic procedure performed on Plaintiff (right shoulder arthroscopy) was six weeks; Dr. Smid noted six months. As such, Hartford concluded that, as of April 2009, the records supported Plaintiff's inability to perform one or more of the Essential Duties of her own occupation. Plaintiff had some degree of functionality at the time, and her condition was expected to improve following the arthroscopy. Therefore, Hartford planned to follow up in three months to determine whether Plaintiff was capable of performing a sedentary occupation with limited reaching by September. (R. 00026-00027.)  Approximately three months

6

later, a Hartford representative spoke with Plaintiff in July 2009 and learned that she had not returned to work. (R. 00024.)

D.    "To Whom It May Concern" Letter

On August 10, 2009, Hartford sent another request for information about Plaintiff's functionality to Dr. Smid. (R. 00220.) On August 20, 2009, Hartford received not the completed form as requested, but a "To Whom It May Concern" letter from Dr. Smid's practice dated August 13, 2009. The three-paragraph letter stated that Dr. Smid had been seeing Plaintiff for several years:

> I have been following her for multiple complaints including the right shoulder and her right knee. More recently she has been having lower back issues. She underwent right shoulder arthroscopy with rotator cuff repair. She is having difficulty recovering from her shoulder surgery, still has pain and limited motion. As for her knee she has had two arthroscopies, Synvisc, and is still very symptomatic within the right knee. She has been seen by a spine surgeon as well as a pain clinic for her lower back.
>
> Give[n] her multiple maladies I find it very unlikely that she is going to return to her previous duties. The most she may be able to do is some sedentary duty and I find this very unlikely as well.

(R. 000219.) Medical records from Dr. Smid's practice were also provided. These records included visits made by Plaintiff to Dr. Smid on February 9, 2005, and March 2, 2005. Also included were copies of records from office visits of June 11, 2008; June 18, 2008; and July 16, 2008, which had previously been reviewed by Hartford.

Because no functionality update was provided, Hartford sent another request to Dr. Smid for information on Plaintiff's condition as of August 26, 2009. (R. 00217-00218.) On September 4, 2009, Hartford attempted to reach Dr. Smid by telephone. (R. 00021.) Also on that date, Hartford advised Plaintiff that Dr. Smid had not provided information about her functionality,

including any limitations or restrictions. (R. 00052.) Later that day, Hartford received a facsimile from Dr. Smid consisting of the questionnaire that he had been sent on August 26, 2009, which he had completed to include restrictions and limitations. (R. 00217-00218.) Dr. Smid indicated that Plaintiff could sit three hours at a time, walk and stand up to 1.5 hours at a time in an 8 hour day, that she could frequently lift ten pounds, and constantly lift five pounds. Further, he noted limitations on her ability to perform upper extremity activities as "right shoulder with minimal abduction, IR/ER." He did not indicate that any further procedures had been performed since April 7, 2009, and he did not add additional comments to his responses. (R. 00218.)  Hartford sent Dr. Smid a more detailed questionnaire related to Plaintiff's functionality on September 9, 2009. Specifically, Hartford asked Dr. Smid to provide complete information regarding any restrictions. (R. 00201.)

E.    Dr. Smid's September 2009 APS

Dr. Smid's office responded by sending records on September 14, 2009. (R. 00201-00216.) Those records included records from Plaintiff's office visits with Dr. Smid in 2009 and also included the APS completed by Dr. Smid on September 14, 2009. In the APS, Dr. Smid stated that Plaintiff's functional capabilities were essentially the same as those received via facsimile on September 4, 2009: Plaintiff could sit three hours at a time and stand and walk 1.5 hours at a time in an eight hour day. She could never lift/carry over ten pounds with her right arm, lift/carry over 50 pounds with both arms, or reach above the shoulder with her right arm. She could occasionally lift/carry up to ten pounds with her right arm, lift/carry 11-50 pounds with her left arm, and reach at or below waist/desk level with the right arm. She could frequently lift/carry up to ten pounds with the left arm, reach with the left arm, and could also frequently perform fingering/handling with both hands. Dr. Smid did not impose any limitations on Plaintiff's ability

to bend, kneel/crouch, or drive. The expected duration of these restrictions was four months, and the only treatment listed was physical therapy. There were no referrals to other physicians. (R. 00202-00203).

F.      Employability Analysis

On September 16, 2009, David Pritchard, M.S., a Hartford Rehabilitation Case Manager and Certified Rehabilitation Counselor, prepared a comprehensive Employability Analysis and report of potential occupations Plaintiff could perform, using the OASYS (Occupational Access System).[4] The analysis used the restrictions that Dr. Smid had indicated in his September 14, 2009, APS. Based on her functional capabilities, education, training, and work history, Hartford identified eight potential occupations. Of these occupations, one was selected as a reasonable and appropriate occupation based on Plaintiff's work history, education, and physical abilities. (The remaining positions did not meet Dr. Smid's restrictions, were not prevalent in the national economy, or would require additional experience.)

The identified occupation was Bonder, Semiconductor.[5] This was an unskilled occupation that was prevalent in the national economy, met Dr. Smid's physical restrictions for Plaintiff, and met or exceeded the required earning potential of $993.20 per month (the national median wage

_____

[4]OASYS "is a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles (DOT)." (R. 00190).

[5]The Bonder, Semiconductor "[t]ends automatic bonding machine that bonds gold or aluminum wire to integrated circuit dies to connect circuitry to package leads." (R. 00198).  Some of the associated duties of the occupation include: reviewing schematic diagram or work order to determine bonding specifications; turning dial to set bonding machine temperature controls and to regulate wire feeding mechanism; mounting spool of wire onto holder and inserting wire end through guides using tweezers, and activating machine that automatically bonds wire to specified connections on semiconductor package loads. *Id.*

for this job was $2730.00 per month). The report included the DOT codes and Occupational Descriptions for the Bonder, Semiconductor occupation, which was classified as a "sedentary" occupation in the Employability Analysis printouts. (R. 00190-00199.)

G.    Claim for Benefits based on "Any Occupation" Denied

Following the Employability Analysis, the file was returned to the claims department for a determination. On September 17, 2009, Hartford denied the claim for benefits under the Any Occupation definition of disability. The determination letter summarized the relevant medical records and the Employability Analysis, and concluded that Plaintiff was "not prevented from performing the essential duties of Any Occupation." (R. 00185-00189.)

H.    Plaintiff Appeals Denial and Submits Additional Records

Plaintiff appealed the denial on September 28, 2009. (R. 00183-00184.) She stated that Hartford had not reviewed all medical records and, for the first time, she identified other doctors (Dr. Patrick K. Denton, Dr. Danny W. Nicholls, and Dr. Rakesh Chokshi). She did not indicate that these doctors had treated her for the condition on which her claim was based (right knee), but said they had treated her left shoulder. She also identified a family physician, Dr. Haynes Cains, and mentioned that Dr. Smid had performed surgery on both of her hands. (R. 00183.)

Plaintiff called the appeal specialist assigned to her claim on October 28, 2009, and advised that she had more medical records that she wanted Hartford to consider during the appeal. She said that she had shoulder, back, and knee problems, and that she also suffered from diabetes and hypertension. She said no one would hire her because she was an employment risk and there were no jobs in her area. The appeal specialist explained that Hartford had considered her medical records, specifically the information from Dr. Smid, which showed that Plaintiff could work in a sedentary capacity. Plaintiff responded that she needed back surgery and that she could not sit,

stand, or walk for a long period of time. She said she was confined to her house. The appeal specialist advised Plaintiff to send any additional records that she had so Hartford could review them. (R. 00009.)

Subsequently, Plaintiff sent additional records. They included records from Pee Dee Orthopaedic (the practice of Drs. Denton, Nicholls, and Chokshi) as well as earlier records from Dr. Smid confirming that he had performed left and right carpal tunnel release procedures on Plaintiff in 2004 and 2005. (R. 00118-00179.) Although the records showed that Plaintiff had been treated for carpal tunnel syndrome, shoulder discomfort, and degenerative disc disease, most of these records were from an earlier time frame and did not relate to the time at issue, September 2009.[6]

I.    Hartford Sends File for Independent Review

On November 13, 2009, Hartford referred Plaintiff's records for a peer review through Reliable Review Services ("RRS"). (R. 00112.) Hartford included all Plaintiff's medical records, which spanned from May 2004 to September 2009, as well as Plaintiff's most recent statements of functionality. RRS was asked to have a physician with the appropriate specialty review the information and provide an opinion as to overall functionality, including limitations/restrictions. The physician was also asked to contact Dr. Smid. (R. 00113.)  RRS obtained a peer review,

_____

[6]The records reveal that the Plaintiff complained about bilateral carpal tunnel syndrome and left shoulder pain as early as 2004.  As of January 7, 2008, she had reached maximum medical improvement with an 8% impairment to her left upper extremity following an operation for left shoulder impingement syndrome and partial rotator cuff tear.  As of March 19, 2008, she had reached maximum medical improvement as to her carpal tunnel with a permanent impairment to her upper extremity of 5%.  Nonetheless, she continued to work until she said she "couldn't walk on [her] leg" after suffering an injury at work on June 11, 2008 and filed her claim for long term disability benefits.

dated December 1, 2009, with an addendum dated December 4, 2009. (R. 00096-00111.) The Reviewer was Richard Kaplan, M.D., Board Certified in Physical Medicine and Rehabilitation Pain Management. (R. 00111.) Dr. Kaplan's seven-page, single-spaced report begins with a thorough review and summary of Plaintiff's records. As part of his review, Dr. Kaplan had tried to reach Dr. Smid but, as of the time the initial report was completed, Dr. Smid had not returned the messages that Dr. Kaplan had left over a three-day time period. (R. 00007.) Dr. Kaplan prepared an initial report. His assessment of Plaintiff's functional limitations as of September 17, 2009, based on the objective findings from physical examinations and tests (including MRIs and x-rays), was that the restrictions and limitations imposed by Dr. Smid in his September 14, 2009, APS were appropriate. (R. 00101-00102).  Plaintiff could lift up to 10 pounds with the right arm occasionally and with the left arm frequently.

The appeal specialist from Hartford spoke with Plaintiff on December 3, 2009, after it had received the initial report from Dr. Kaplan. The appeal specialist explained that, although Dr. Kaplan had been unable to get in touch with Dr. Smid, he found the medical evidence clear and thorough. Further, she explained that Dr. Kaplan agreed with Dr. Smid's September 2009 assessment.  Dr. Kaplan subsequently submitted an addendum report to Hartford, which included a summary of the conversation he had with Dr. Smid:

> I spoke with Dr. Smid at 1155 on November 25, 2009. We concurred that the restrictions/limitations recommended by Dr. Smid on [September] 14, 2009 remain valid and appropriate in this case for the reasons outlined in Dr. Smid's notes and in my recent report.

(R. 00102.)

J.    Appeal Denied

On December 10, 2009, Plaintiff called Hartford. She was advised that Dr. Kaplan had

spoken with Dr. Smid, but the discussion did not change the decision because "he felt she could

perform sedentary work." (R. 00005.)  Hartford explained that the letter advising Plaintiff of the

decision was in the mail.  The letter denying Plaintiff's appeal was dated December 10, 2009. (R.

00048-00049.) In the letter, Hartford explained that its decision was based on all documents

contained in the claim file, viewed as a whole. Hartford noted that it had received Plaintiff's

appeal letter and the supplemental medical information that she provided. The denial letter further

explained that RRS had provided an independent physician review of the claim file and, based

on this evidence, Plaintiff's limitations/restrictions were consistent with sedentary work, and the

Employability Analysis had identified an appropriate occupation. The denial letter indicated

Plaintiff was not prevented from performing Any Occupation as of September 17, 2009, and the

decision was upheld:

> As part of our appeal review, we asked Reliable Review Services
> ("RRS") to coordinate an independent physician review to clarify
> your condition and functionality. At the same time, we sent a letter
> to Dr. Smid on 11/13/09 to explain that a physician associated with
> RRS would contact him on our behalf to clarify your condition,
> treatment and functionality. This review was performed by Dr.
> Richard Kaplan, specialist in physical medicine, rehabilitation and
> pain management.
>
> Dr. Kaplan noted that your medical records include very detailed
> documentation of treatment over the past few years for multifocal
> complaints in spine and limbs which has been treated with shoulder
> surgery and extensive pain management. On 8/13/09 Dr. Smid
> summarized your complaints of right shoulder and knee pain, low
> back pain, history of right shoulder arthroscopy and rotator cuff
> repair with residual pain and limited range of motion. Dr. Smid also
> noted two arthroscopies of your right knee prior to treatment with
> Synvisc and that you still had ongoing pain in your right knee and
> had been seen by spine surgeon and pain clinic for low back pain.

Dr. Kaplan said the documentation supports a multi-focal pain syndrome and an uncertain exact ongoing active diagnosis. He noted you have had a thorough work-up including a number of diagnostic studies in recent years. On 9/14/09 Dr. Smid noted your primary diagnosis was arthroscopic rotator cuff repair of right shoulder, with secondary right knee instability, low back pain and recurrent bursitis. Dr. Smid opined that you could sit for three hours at a time, stand and/or walk for one and a half hours at a time, and could cumulatively perform these activities for a total of eight hours during the day. He felt you could occasionally lift 10 pounds on the right and frequently lift 10 pounds on the left, up to 50 pounds occasionally on the left; you could never lift above shoulder or below waist on the right but you could on the left; and you could frequently perform bilateral fingering and handling.

In a conversation with Dr. Smid on 11/25/09, Dr. Kaplan and Dr. Smid agreed that these limitations were reasonable given your multiple complaints and that they remain valid and appropriate.

The above limitations are consistent with sedentary work and the occupations identified by the RCM in the employability analysis dated 9/16/09. Since you have work capacity, the medical documentation and professional opinions confirm that you are not prevented from performing any occupation as defined by the policy on and after 9/17/09. The decision to terminate your LTD benefits was correct.

(R. 00048-00049.) Plaintiff was advised that this was the final determination on her claim and the record on appeal was closed. *Id.*

K.    Plaintiff Retains Counsel; Attempts to Submit Additional Physical Capacities Evaluation

On January 6, 2010, Plaintiff's counsel advised Hartford that Plaintiff had retained her regarding her appeal and asked for a copy of the claim file. (R. 00083-00084.) Although the appeal had been concluded, Plaintiff's counsel sent additional information on January 21, 2010. (R. 00077-00078.) That additional information consisted of a one-page Physical Capacities Evaluation form completed by Dr. Smid on January 14, 2010. (R. 00078.) Hartford acknowledged

14

the letter and advised that the appeal was final and it would not consider the information. (R. 00044.)

## The Policy Terms

The Policy's definition of "disability" or "disabled" is as follows:

> **Disability or Disabled** for other employees means that during the Elimination Period and for the next 12 months you are prevented by:
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

(R. 00350). "Any Occupation" is defined as follows:

> **Any Occupation** means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.

(R. 00350).  Plaintiff's benefit percentage was 50%. (R. 00337).  Benefits continue for a maximum of 60 months (R. 00338), provided the Plaintiff provides satisfactory proof of continued disability from "Any Occupation," as defined above. In no event, however, will benefits be payable beyond 09/16/2013.

If a claim is initially denied, the Plan provides the following procedures on appeal:

> The individual reviewing your appeal shall give no deference to the initial benefit decision and shall be an individual who is neither the individual who made the initial benefit decision, nor the subordinate

15

of such individual. The review process provides for the identification of the medical or vocational experts whose advice was obtained in connection with an initial adverse decision, without regard to whether that advice was relied upon in making that decision. When deciding an appeal that is based in whole or in part on medical judgment, we will consult with a medical professional having the appropriate training and expertise in the field of medicine involved in the medical judgment and who is neither an individual consulted in connection with the initial benefit decision, nor a subordinate of such individual.

(R. 00366).

Finally, the Policy contains the following language that clearly vests Hartford with discretionary authority to make benefit determinations and to interpret Policy provisions:

**Who interprets policy terms and conditions?**
We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

(R. 00349).

The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

(R. 00362).

## Scope of Review

Where an ERISA plan confers upon its administrator discretionary authority in the exercise of its power, the administrator's denial of benefits is reviewed under an abuse-of-discretion standard. *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan,* 201 F.3d 335, 341 (4th Cir. 2000). Such a discretionary decision "will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989)). The administrator's decision is reasonable "if it is the result

of a deliberate, principled reasoning process and if it is supported by substantial evidence," *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 787 (4th Cir. 1995), which is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *English v. Shalala,* 10 F.3d 1080, 1084 (4th Cir. 1993) (citation omitted).  In weighing the reasonableness of the plan administrator's determination, the Court may consider, but is not limited to, the following factors:

> (1) the language of the Plan; (2) the purposes and goals of the Plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest.

*Booth,* 201 F.3d at 342-43; *Champion v. Black & Decker (U.S.) Inc.,* 550 F.3d 353, 359 (4th Cir. 2008); *Williams v. Metropolitan Life Ins. Co.,* 609 F.3d 622, 630 (4th Cir. 2010).

In *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008), the Supreme Court held that an insurance company, which served as both administrator with discretionary authority to determine claims and insurer with responsibility of paying the claims, functioned under a conflict of interest.  Such a conflict of interest, however, does not change the standard of review in ERISA cases.  Rather, "when reviewing an ERISA plan administrator's discretionary determination, a court must review the determination for abuse of discretion and, in doing so, take the conflict of interest into account only as 'one factor among many' that is relevant in deciding

whether the administrator abused its discretion." *Champion,* 550 F.3d at 358 (quoting *Glenn,* 554 U.S. at 116).[7]

### Discussion

A.    The Court Must Apply an Abuse-of-Discretion Standard

Plaintiff admits that the Policy grants Hartford discretionary authority to make claims determinations and that, where abuse-of-discretion is the standard of review, an insurer's decision will not be disturbed if it is reasonable. (Pl. Br. at p. 3.)  However, she also suggests that the Court "should reduce the deference given the [Hartford's] decisions to a de novo or, at a minimum, a modified abuse of discretion standard, in order to neutralize the untoward influence resulting from that direct conflict of interest." (Pl. Br. at p. 4.)  Despite Plaintiff's contentions, there simply is no longer any such thing as a "modified abuse of discretion" standard of review in the Fourth Circuit. *Champion,* 550 F.3d at 358 (holding that, after *Glenn,* the presence of a conflict of interest does not "change the standard of review from the deferential review, normally applied in the review of discretionary decisions, to a *de novo* review, or some other hybrid standard.").  In fact, in *Glenn,* the Supreme Court stated broadly that a conflict of interest should not lead to "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.*  Rather, a conflict of interest becomes just one

---

[7]Before the Supreme Court's decision in *Glenn,* courts in this Circuit reviewing a plan administrator's decision, where the administrator both determined benefit eligibility and paid claims, applied a "modified abuse-of-discretion" standard. *See Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228 (4th Cir. 1997).  Under this standard, the administrator's decision was given less deference if the administrator had a conflict of interest.  Thus, a conflict would modify the abuse of discretion standard according to a "sliding scale," requiring greater objective reasonableness and more substantial evidence in support of a decision depending on the degree of the administrator's financial incentive to benefit itself by reaching a certain outcome. *See id.*

of the "several different, often case-specific, factors" to be weighed together in determining whether the administrator abused its discretion. *Id.* Thus, the Court must review Hartford's denial of benefits under an abuse-of-discretion standard.

B.    <u>Hartford's Decision was Reasonable, and Plaintiff Received a Full and Fair Review</u>

I.

The administrative record in this case, viewed as a whole, constitutes substantial evidence adequate to make a disability determination and supports Hartford's determination that Plaintiff was not disabled based on the Plan's "Any Occupation" definition on and after September 17, 2009. The administrative record consists of over 300 pages, including numerous medical records from Dr. Smid. Hartford evaluated all the records available at each step in the claim and appeal process. Moreover, Hartford obtained an Employability Analysis and report from David Pritchard, M.S., a Certified Rehabilitation Counselor, to identify an appropriate alternative occupation that Plaintiff was capable of performing, taking into consideration the most recent restrictions and limitations recommended by Dr. Smid. Eight potential occupations were identified, and "Bonder, Semiconductor" was selected as a reasonable and appropriate occupation based on Plaintiff's education, training, work history, and physical abilities. As such, Plaintiff's claim was denied under the Any Occupation definition of disability. After the initial denial, Hartford obtained a separate review of the claim file by an independent physician. Dr. Kaplan made a thorough analysis of the entire record and prepared a detailed report. He also spoke with Dr. Smid before concluding that "the restrictions/limitations recommended by Dr. Smid . . . remain valid and appropriate in this case for the reasons outlined in Dr. Smid's notes and in my recent report." (R. 00102). Additionally, Hartford kept Plaintiff well informed regarding the status of her claim throughout the decisionmaking process. The record reflects numerous telephone conversations

19

between Plaintiff and Hartford representatives and reveals that Hartford endeavored to explain the process to Plaintiff and to answer any and all questions that she had. Further, Hartford prepared thorough correspondence to Plaintiff to explain each step of the process.

These facts establish that Hartford's "decision to terminate [Plaintiff's] disability benefits resulted from a process that was deliberate and principled." *Donnell v. Metro. Life Ins. Co.*, 165 Fed. Appx. 288, 294-95 (4th Cir. 2006) (approving of decisionmaking process that included review of all submitted medical evidence, measurement of claimant's vocational abilities, an independent medical evaluation, and timely notice of claim status); *see Hensley v. IBM*, 123 Fed. Appx. 534, 538 (4th Cir. 2004) (record demonstrated decision to terminate benefits resulted from a deliberate, principled reasoning process where administrator issued multiple requests for information from claimant's physicians, conducted several reviews of her medical records by independent consultants, and, on appeal, gave consideration to claimant's supplemental medical evidence); *Tucci v. First Unum Life Ins. Co.*, 446 F. Supp. 2d 473, 484-85 (D.S.C. 2006) (review process "deliberate and principled" where insurer obtained input from treating physicians, obtained multiple medical reviews of claimant's records, reviewed all medical records, offered claimant the opportunity to provide supplemental medical evidence, advised claimant of her rights, and kept claimant apprised of the status of her claim).

## II.

Plaintiff suggests that Hartford's decision was unreasonable in light of the "To Whom It May Concern" letter from Dr. Smid's practice dated August 13, 2009, which stated "[t]he most she may be able to do is some sedentary duty and I find this very unlikely as well." However, the record supports the conclusion that Hartford's decision was the result of a deliberate, principled reasoning process. The medical records provided to Hartford showed that Dr. Smid

had performed arthroscopic surgery on Plaintiff in July 2008 and again in April 2009. Following that second surgery, Dr. Smid expressed the opinion that Plaintiff's condition would continue to improve and that the anticipated duration of her condition was six months. (R. 00229.) On June 4, 2009, while Plaintiff continued to report discomfort, Dr. Smid noted that her range of motion had improved somewhat.  An August 13, 2009 "To Whom It May Concern" letter from Dr. Smid states that Plaintiff had multiple complaints and concluded that "[g]ive[n] her multiple maladies I find it very unlikely that she is going to return to her previous duties. The most she may be able to do is some sedentary duty and I find this very unlikely as well." (R. 00219.) Nonetheless, Dr. Smid's functionality assessments of the Plaintiff submitted after this letter appear inconsistent with his statement that sedentary duty is "very unlikely as well."  After receiving this letter on August 21, 2009, Hartford followed up for clarity concerning the Plaintiff's functionality, including any limitations and restrictions. Hartford reviewed again the restrictions that Dr. Smid had included in his more detailed April 2, 2009 APS and, in a facsimile to Dr. Smid, asked: "Have there been any changes in her functionality?" Dr. Smid responded on or about September 3, 2009, but put nothing in the blank space left for an answer to this question. He did, however, opine that Plaintiff could sit 3 hours in an 8-hour day, stand 1.5 hours in an 8-hour day, and walk 1.5 hours in an 8-hour day. He further wrote that Plaintiff could lift/carry five pounds constantly and ten pounds frequently due to the issues with Plaintiff's right shoulder. Finally, he stated that Plaintiff had not reached maximum medical improvement. (R. 00217-00218.) Thus, the detailed responses

to Hartford's subsequent questions about functionality were consistent with Dr. Smid's earlier reports and indicated that Plaintiff was, in fact, able to perform a sedentary occupation.[8]

### III.

Plaintiff also argues that "Defendants continuously relied on the opinions of Plaintiff's treating physician, who oftentimes gave limitations and restrictions and also opined that Plaintiff was unable to work [under the Your Occupation definition of disability, but] Defendants failed to consider the same combination of information when investigating Plaintiff's claim for disability under the Any Occupation definition of disability." (Pl. Reply at 7); *see id.* at 2 ("[A]t some point, Defendants deviated from this process and arrived at a decision to terminate Plaintiff from further benefits."). However, this statement is unsupported by the record. Hartford's interpretation of the Plan and application of its provisions was not inconsistent; rather, the relevant

---

[8]Throughout the record, the parties disagree as to whether Plaintiff is capable of performing "sedentary" work. Neither party directs the Court to authority or provides guidance as to how "sedentary" should be defined. Additionally, neither the Plan nor the Policy defines sedentary or explains what constitutes a sedentary occupation. Other Circuits have adopted the Social Security Administration's ("SSA") definition of that term in ERISA cases. *See, e.g., Connors v. Conn. Gen. Life Ins. Co.,* 272 F.3d 127, 136 n.5 (2d Cir. 2001); *see generally* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."). In the instant matter, the Employability Analysis, which classifies the Bonder, Semiconductor job as a sedentary occupation, defines the term as "Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally. Mostly sitting, may involve standing or walking for brief periods of time." (R. 00199). While it is unclear whether the Fourth Circuit has adopted a specific definition for sedentary work, the Fourth Circuit recently applied a definition similar to the above definitions in an ERISA case. In *DuPerry v. Life Ins. Co. of N. Am.,* --- F.3d ----, 2011 WL 199087, at *1 (4th Cir. Jan. 24, 2011), the court stated that a "sedentary" occupation is one that "require[s] lifting, carrying, pushing, or pulling 10 pounds occasionally and that although it involve[s] mostly sitting, it could involve standing or walking for brief periods." This Court finds it appropriate to apply this definition of "sedentary" in the instant matter.

definition of disabled under the Policy changed, as Plaintiff had to meet the Any Occupation definition of disability on or after September 17, 2009.  It appears that Plaintiff attempts to argue around this fact and ignores the fact that Dr. Smid's last two functionality assessments prior to the September 17, 2009 determination support the conclusion that Plaintiff could perform sedentary work.

Dr. Smid's functionality assessments reveal that Plaintiff consistently progressed from the first APS that was submitted with Plaintiff's claim to the September 14, 2009, APS:

**September 11, 2008**- Plaintiff limited to minimal standing and walking for activities of daily living only, sitting for 2 hours at a time, and no lifting/carrying. (R. 00323-00324);

**February 5, 2009**- Plaintiff could sit two hours and stand or walk 30 minutes in an eight hour day. (R. 00243);

**April 2, 2009**- She could occasionally lift or carry up to 10 pounds with her right arm, but could never lift or carry more than 10 pounds with that arm. She could reach above her right shoulder with her right arm only occasionally, but could frequently use the right arm to lift at or below waist level. There were no restrictions on the use of her left arm. (R. 00231);

**April 10, 2009**- Plaintiff could sit two hours at a time for an eight-hour day. Plaintiff could stand/walk for thirty minutes at a time, for a total of four hours per day. She could not use her upper right extremity because she had just undergone rotator cuff surgery. (R. 00229);

**September 3, 2009**- Plaintiff could sit three hours at a time, walk or stand up to 1.5 hours at a time in an eight hour day, and she could frequently lift ten pounds, and constantly lift five pounds. He noted limitations on her ability to perform upper extremity activities as "right shoulder with minimal abduction, IR/ER." (R. 00218);

**September 14, 2009**- Plaintiff could sit three hours at a time and stand and walk 1.5 hours at a time in an eight hour day. She could never lift/carry over ten pounds with her right arm, lift/carry over 50 pounds with both arms, or reach above the shoulder with her right arm. She could occasionally lift/carry up to ten pounds with her right

arm, lift/carry 11-50 pounds with her left arm, and reach at or below waist/desk level with the right arm. She could frequently lift/carry up to ten pounds with the left arm, reach with the left arm, and could also frequently perform fingering/handling with both hands. Dr. Smid did not impose any limitations on Plaintiff's ability to bend, kneel/crouch, or drive. (R. 00202-00203).

While the more recent functionality assessments precluded Plaintiff from performing one or more of the Essential Duties of her own occupation, they are consistent with sedentary work.[9] The critical issue in this case is Plaintiff's condition as of September 17, 2009; for which the most relevant medical evidence was the September 14, 2009 APS wherein Dr. Smid stated that Plaintiff could sit three hours at a time, stand/walk 1.5 hours at a time, occasionally lift/carry ten pounds with her right arm, and frequently lift/carry ten pounds with her left arm. The only record of an office visit to Dr. Smid during this time frame was a record from Plaintiff's visit to his practice on September 3, 2009. (R. 00216). During the visit, Dr. Smid noted that Plaintiff's right shoulder was improved. He also acknowledged that he could not explain Plaintiff's knee pain that she continued to report, noting that the findings from two arthroscopies were "minimal." In his notes from this visit, Dr. Smid gave no opinion regarding disability, nor did he identify any restrictions on Plaintiff's ability to work. *Id.* Thus, it appears Plaintiff's restrictions did not preclude her from performing sedentary work on or after September 17, 2009. David Pritchard, M.S., a Hartford Rehabilitation Case Manager and Certified Rehabilitation Counselor, prepared a comprehensive Employability Analysis of potential occupations Plaintiff could perform on September 16, 2009. Based on Plaintiff's functional capabilities, education, training, and work

---

[9]*See DuPerry v. Life Ins. Co. of N. Am.,* --- F.3d ----, 2011 WL 199087, at *1 (4th Cir. Jan. 24, 2011) (stating that a "sedentary" occupation is one that "require[s] lifting, carrying, pushing, or pulling 10 pounds occasionally and that although it involve[s] mostly sitting, it could involve standing or walking for brief periods").

history, he identified a reasonable and appropriate sedentary occupation: Bonder, Semiconductor.[10]

This was an unskilled occupation that was prevalent in the national economy, met Dr. Smid's

physical restrictions for Plaintiff, and met or exceeded the required earning potential.  As such,

Plaintiff was not precluded from performing the Essential Duties of Any Occupation on and after

September 17, 2009, and Hartford's decision was reasonable and consistent with the language of

the Plan.

IV.

According to Plaintiff, after closing the record and issuing a final denial on December 10,

2009, Hartford should have reopened the claim for a second appeal when it received the one-page

Physical Capacities Evaluation completed by Dr. Smid on January 14, 2010.  However, that

document has no relevance to the reasonableness of the final decision made four months earlier

because it was not in existence. *See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.,* 32 F.3d

120, 125 (4th Cir. 1994) (stating that the reviewing court may only consider evidence that had

been presented to the administrator at the time the challenged decision was made in determining

whether the decision was reasonable under the abuse-of-discretion standard); *see also Mason v.*

*M.F. Smith & Assocs.,* 158 F. Supp. 2d 673, 686 (holding that doctor's letter submitted after

administrative record closed should not be considered).  Hartford properly allowed Plaintiff to

present additional evidence after her claim was initially denied and during the appeal stage, and

the record reflects that Hartford considered all of the records that Plaintiff timely submitted before

---

[10]While the fact that David Pritchard is a Hartford Rehabilitation Case Manager may "prove [the conflict of interest factor] more important" *Glenn,* 554 U.S. at 117, Plaintiff has submitted no vocational evidence to contradict his finding that the Bonder, Semiconductor job is an occupation "for which [Plaintiff was] qualified by education, training or experience, and that has [the required] earnings potential." (R. 00350).

December 10, 2009.   Even if this Court was to consider Dr. Smid's post-appeal Physical

Capacities Evaluation form dated January 14, 2010, that form does not indicate that Plaintiff is

unable to perform sedentary work or precluded from performing one or more of the Essential

Duties of Any Occupation, specifically the job of Bonder, Semiconductor.[11]

V.

Moreover, Plaintiff implies that Hartford had a duty to obtain diagnostic testing or to create

or supplement the administrative record with "actual vocational examinations or functional capacity

evaluations" before making its final determination. (Pl. Br. at p. 6.)   Plaintiff offers no citation

to any authority for this argument.   Notably, a plan is not required as a matter of law to obtain

vocational or occupational expertise in its evaluation of an employee's claim. *See LeFebre v.*

*Westinghouse Elec. Corp.,* 747 F.2d 197, 206 (4th Cir. 1984), *overruled by implication on other*

---

[11]The post-appeal evaluation form by Dr. Smid is not substantially different from the earlier forms submitted by Dr. Smid, except that, in the post-appeal form Dr. Smid checked the box for "unable to return to work" at the top of the page.   However, the form does not clarify whether, in Dr. Smid's opinion, Plaintiff is unable to return to her "own occupation" or unable to perform "Any Occupation."   Additionally, his responses to the rest of the questions would not preclude Plaintiff from doing sedentary work. Dr. Smid indicated that Plaintiff could sit for three hours of an eight-hour work day and that she could stand or walk for two hours of an eight-hour day.   She could frequently perform gross and fine manipulation (grasping, twisting, handling, and finger dexterity). She could occasionally engage in pushing/pulling, bending/stooping, reaching (including overhead), and operating motor vehicles.   She could rarely climb stairs or ladders, balance, and work around hazardous machinery.   The medical diagnosis for these restrictions was "rotator cuff tear right shoulder, degenerative joint disease [right] knee." (R. 00078).   While he checked a box indicating that the "most reasonable lifting and/or carrying expectation for this patient during a normal work day is . . . 5 lbs. [o]ccasionally to 1 lbs. frequently", Dr. Smid has consistently opined in his functionality assessments that Plaintiff can occasionally lift/carry 11-50 pounds with her left arm, and frequently lift/carry up to ten pounds with the left arm. *See, e.g.,* (R. 00202-00203). Additionally, his last two functionality assessments, which were submitted in September 2009, indicate that Plaintiff can, at the very least, occasionally lift/carry up to 10 pounds with her right arm as well. *See* (R. 00202-00203, 00218).

26

*grounds* by *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003).  Case law in this Circuit holds that "a plan administrator is under no duty to secure specific forms of evidence" to prove the claimant's claim. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608 (4th Cir. 1999) (holding that Sara Lee did not need to secure vocational consultant to determine if Elliot could perform any jobs).  In *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228 (4th Cir. 1997), the plaintiff argued that the insurer was obligated to tell her what she needed to do to get benefits. The Fourth Circuit disagreed:

> That is not [the insurer's] role as a fiduciary. [The insurer] must treat each claimant with procedural fairness, but, because it must also guard against improper claims, it is not its duty to affirmatively aid claimants in proving their claims.

Id. at 236.

Further, the Policy provides that Plaintiff must "submit Proof of Loss satisfactory to us."[12] (R. 00340) "Proof of Loss" is defined at length in the Policy. In general, it includes documentation of the date, cause, and prognosis of the claimant's disability; information regarding pre-disability earnings and other income benefits; and the names and addresses of all physicians. It also includes "any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes." (R. 00348.)  Obviously, Plaintiff, on whom the Plan indisputably placed the burden to establish disability, could have elected to bolster her claim by obtaining additional vocational or diagnostic evidence as part of her submission to Hartford.  Plaintiff did not do so, and Hartford

---

[12]*See* (R. 00353) (defining "us" as Hartford Life and Accident Insurance Company).

was free to exercise its discretion not to procure such additional evidence.[13] *See Elliott,* 190 F.3d at 608.

VI.

The Court must also consider Hartford's conflict of interest in assessing Plaintiff's claim for benefits.  Hartford operated under a conflict of interest because it "serv[ed] both as administrator of the plan with discretionary authority to determine entitlement to benefits and to construe disputed terms and as insurer of the plan with responsibility for paying benefits." *Carden v. Aetna Life Ins. Co.,* 559 F.3d 256, 260 (4th Cir. 2009).  While the Court understands Plaintiff's concerns regarding a conflict of interest arising from the dual role of determining eligibility and paying benefits, Hartford took numerous measures to ensure objectivity by seeking an independent review of Plaintiff's medical records by Dr. Kaplan, soliciting Dr. Smid's comments through the peer review process, and obtaining an Employability Analysis and report.  Additionally, there is no evidence that Hartford made any unreasonable interpretations of the Policy, and Plaintiff has submitted no evidence that the conflict of interest was a factor in the denial of Plaintiff's long term disability benefits claim on September 17, 2009.  As such, the Court finds that, while Hartford operated under a conflict of interest, the majority of other factors favor a finding that Hartford did not abuse its discretion.

C.    <u>Attorneys' Fees and Costs</u>

Plaintiff has requested attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).  Section 1132(g) states in part that "[i]n any action under this subchapter . . . by a participant, beneficiary,

---

[13]The Plan provides: "We <u>may have</u> You examined to determine if You are Disabled. Any such examination will be: 1. at our expense; and 2. as reasonably required by us." (R. 00348) (emphasis added).

or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).  The Fourth Circuit has adopted a five-factor test to guide courts' discretion in determining whether an attorneys' fee award is warranted under ERISA. The five factors are: (1) degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. *Quesinberry v. Life Ins. Co. Of N. Am.,* 987 F.2d 1017, 1029 (4th Cir. 1993).  Plaintiff has not established a sufficient basis for this Court to award attorneys' fees and costs.  The Court, therefore, in its discretion denies her request.

## Conclusion

For the reasons stated above, Plaintiff's claim for benefits under 29 U.S.C. § 1132(a)(1)(B) is dismissed because the Plan Administrator's decision to deny Plaintiff's claim for long term disability benefits on and after September 17, 2009, was the result of a deliberate, principled reasoning process and supported by substantial evidence.  Hartford did not abuse its discretion. Plaintiff's request for attorney's fees and costs is also denied.   Specifically, Plaintiff's [Docket #29] motion for judgment is **DENIED**.   Defendant's [Docket #28] motion for judgment is **GRANTED**.   This case is hereby **DISMISSED with prejudice**.

**IT IS SO ORDERED**.

Florence, SC                                          s/ R. Bryan Harwell
February 1, 2011                                      R. Bryan Harwell
                                                      United States District Judge